Judge Collett
delivered the opinion of the court:
This action of ejectment was tried on the circuit in Ross county in 1834, a verdict taken for the plaintiff, and the defendant mad© a motion for a new trial, which was reserved for decision here. The motion was heard and overruled by the court in bank at December term, 1834, and the court at the same time, on motion of the defendant, granted a rehearing of the motion, and continued the cause. 6 Ohio, 366.
The rehearing was granted on two points only, but the counsel for the defendant, by leave of the court, have reargued the whole cause. They again contend that a patent to Massie, as assignee, of Powell, should be presumed to have issued. The one hundred acres in controversy are a part of an entry and survey of eight hundred and sixty-five acres in the Virginia military district, made for Powell in 1793. In 1795, N. Massie was in possession of the whole tract, claiming as assignee of Orr, who was assignee of Powell. In 1808, Massie sold the one hundred acres in controversy to Abrams, who, in 1809, sold and conveyed the same to Eindley, and he, in 1814, sold and conveyed to Kerr. *Possession accompanied these sales, and was peaceably held until after the defendant purchased the premises now in dispute, as the property of Kerr, at a sheriff’s sale in 1829, on a judgment obtained against Kerr in 1816. In 1818, a patent was issued, at Kerr’s instance, to the heirs of Powell, on this survey, for the eight hundred and sixty-five acres.
Powell’s survey was made in 1793; the patent to his heirs did *253 not issue until 1818, twenty-five years after. .It is believed that it is not very uncommon for surveys in the Virginia military district to remain unpatented for twenty-five years, especially where the owners die, or are non-resident, as is frequently the case. Since 1807, the title of an owner of an entry and survey of a tract of land, in the Virginia military district, is nearly as secure as it would be if patented. Congress, in that year, passed a law providing that no location should thereafter be made of any land which had been surveyed, and that if any location should be made of any land which had been surveyed before the making of such location, and a patent taken out on such relocation, that the patent should be void. Acts of Congress, with similar provisions, have ever since been in force. This makes owners of surveys neglect to cause their patents to issue.
Before the creation of the general land office, patents for these lands issued from the office of the secretary of state, and were there recorded; since, they all issue from and are recorded in the general land office. If a patent had issued to Massie on Powell’s survey, it is not probable that the-officers in the land office would have issued another on the same survey; and if they had, a copy of the one issued to Massie might have been produced by the defendant. Wallace, in his deposition, says that Kerr, in 1817, discovered that no patent had issued on this survey. He discovered this probably by examining the records of these offices and of the war office, where these surveys are examined before patents issue. 5 Pet. Cond. 243. It seems to us, as it did to the court last year, very clear that no patent in fact issued on Powell’s survey before the one to Powell’s heirs. The defendant’s counsel urge that if the court come to this conclusion, still, after so long an adverse possession, justice and policy require that a grant be presumed, or that Wallace should not be permitted to set up the patent of Powell.
*In 1817, Kerr discovered that this survey was unpatented. Until then he probably believed that he held the fee in the premises, for Findley had made him such a deed, with warranty, in 1814, as would have conveyed the fee if it had been .held by him. Kerr, then, to secure his equitable estate, endangered, as he thought by McArthur’s entry and by the title being in the United States, caused the patent to issue to Powell’s heirs. Kerr continued'in *254 possession until after the property was, as his, sold by the sheriff in 1829, on the judgment of 1816.
The twenty-five years of adverse possession, before the issuing ■of the patent, could not authorize the court to say that it was void, which would virtually be the case if the court were on any grounds to refuse to Powell’s heirs the right of setting it up. We have before said that it is not unusual for these surveys to be unpatented for this length of time. Kerr placed the legal title in the heirs of Powell. After that, the possession of Kerr, in the aspect we are now viewing the case, could hardly be said to be adverse. The title of the defendant can be no better than that of Kerr, and Kerr’s was an equity only, with possession — a right to obtain in chancery a conveyance of the legal estate. 5 Ohio, 455.
The heirs of Powell could set up this patent against the defendant in this action if they had not aliened, and we see nothing in the case to prevent Wallace from doing so. He is a trustee for the heirs and creditors of Massie,'appointed in 1820, with power to get in the title to all lands belonging to them, in their names, and to sell and convey the same for the benefit of the creditors and heirs. 19 Ohio Stat. 30. Wallace obtained, in his own name, a conveyance of the whole of the survey of eight hundred and sixty-five acres from the heirs of Powell, in 1826 and 1830. The deed from Massie to Abrams, although not executed so as to have conveyed the legal estate if it had been held by Massie, contained a covenant of warranty, of which Kerr might have availed himself if his title had failed; yet, as Kerr put the legal title into the hands of Powell’s heirs, Wallace' might have questioned whether if it failed, on that account, the heirs of Massie were liable. As to the equitable estate in the balance of the survey, we do not know where it-was when Wallace became trustee in 1820. It is, then, -clear that Wallace, by taking these conveyances in 1826 and 1830 to himself and not to the heirs of Massie, violated his *trust, ■or that he intended to aid Kerr in defrauding his creditors? If it was, in this court it could make no difference. Kerr had the equity only with the possession. To hold that Wallace’s deed was void, would return the legal title, not to Kerf, and so to the defendant, but to the heirs of Powell. And so, as to the creditors and heirs of Massie. Wallace got the legal title with knowledge of Kerr’s equity, and holds it subject thereto — in chancery, so ha holds in relation to the creditors and heirs of Massie.
*255 It is insisted that when the legal title came to the heirs of Powell, it inured immediately to the alienees of Massie. Powell! sold to Orr, and Orr to Massie. We do not know how Powell-1 conveyed his interest in this survey, whether by assignment or otherwise. It is not probable that, owning the equity only, he assumed to own the fee, and conveyed with warranty in such manner as would have conveyed the fee, if he had then held it. We can not presume that he did so. If he did, the instrument might have been produced, or a copy from the records. Unless the transfer of Powell’s interest was made in this manner, the legal title did not pass by operation of law from Powell’s heirs. Lessee of Patterson v. Pease et al., 5 Ohio, 190; Bond v. Swearingen, 1 Ohio, 395.
Again, it is contended that the defendant is protected in his possession by the statute of limitations. It is the opinion of a majority of the court, that the owner of an entry and survey, in the Yirginia military district, can not sustain an ejectment to recover the possession of the land entered and surveyed. That he must, before he brings his action, obtain the legal title from the United States; that before he does this, his title is an equitable one only. No right of action having accrued to Powell in his lifetime, nor to his heirs, until their patent issued in 1818, which is not yet twenty-one years, this action is not barred by the statute. Upon the whole case, the court are of opinion that the motion for a new trial must be overruled, and judgment entered on the verdict for the plaintiff.